[No. A135745. First Dist., Div. Three. May 31, 2013.]

NEIGHBORS FOR FAIR PLANNING, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent;
BOOKER T. WASHINGTON COMMUNITY SERVICE CENTER, Real
Party in Interest.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication
with the exception of parts II.–VI.

**COUNSEL**

Law Office Of Stephen M. Williams and Stephen M. Williams for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Kristen A. Jensen and Susan Cleveland-Knowles, Deputy City Attorneys, for Defendant and Respondent.

McKenna Long & Aldridge, Denis F. Shanagher, Alice Suet Yee Barkley, Jennifer Chavez; and Anne Morrison Epperly for Real Party in Interest.

OPINION

SIGGINS, J.—The City and County of San Francisco (the City) certified an environmental impact report and issued other approvals for a community center and affordable housing project (Project) proposed by real party in interest Booker T. Washington Community Service Center (the Center). The Project, if it goes forward, will involve the demolition of the Center's existing facility at 800 Presidio Avenue and its replacement with a mixed-use project with 48 units of affordable housing and an expanded and updated community center.

Plaintiff, Neighbors for Fair Planning, a group of local residents that opposes the Project, filed a petition for a writ of mandamus to set aside the City's certification of the final environmental impact report (EIR) and to invalidate its approval of a conditional use permit and special use district. The superior court denied the petition and plaintiff appealed the ensuing judgment. Based on our independent review of the administrative record, we conclude the City's actions are lawful and supported by substantial evidence.[1] Accordingly, we affirm.

## BACKGROUND

### A. The Project and Parties

The Center, a nonprofit organization founded in 1919, has occupied its present location in San Francisco's Western Addition neighborhood since 1952. It currently offers job training, afterschool and teen programs, recreation, counseling on housing and health care, and senior clubs, among other programs, to its ethnically diverse, low- and very-low-income clientele.

The Center proposes to demolish its existing facility, a one-story, 13,745-square-foot community service building, and replace it with a 68,206-square-foot mixed-use development containing expanded community facilities and a five-story residential building. The new community center would include a 7,506-square-foot gymnasium, a child care center, and a state-of-the-art space to support the Center's programs for at-risk youth, with sufficient space to

---

[1] We grant the City and the Center's joint motion to correct or augment the record with the record of the administrative proceedings, which plaintiff should have designated and provided to this court pursuant to the procedure specified in rule 8.123 of the California Rules of Court. (Cal. Rules of Court, rules 8.120(a)(2), 8.123; see rule 8.124(b)(3) ["An appendix must not: [¶] . . . [¶] (C) Contain the record of an administrative proceeding that was admitted in evidence, refused, or lodged in the trial court. Any such administrative record must be transmitted to the reviewing court as specified in rule 8.123."].)

expand the Center's afterschool and teen program from 100 to 150 participants. The housing component will provide 24 affordable studios for low-income households, 24 additional studios for low- to very-low-income emancipated foster youth ("transitional aged youth"), and two two-bedroom units for onsite managers.

Plaintiff does not oppose replacing the current community center with a new facility, but has consistently advocated throughout the planning process for reducing its size, scope and density.

## B. The Environmental Review and City Approval Process

On June 23, 2010, the San Francisco Planning Department (the Department) published and circulated a draft environmental impact report (Draft) for the Project. The Draft addresses the Project's potential adverse impact on the neighborhood's character and physical environment, including its impacts on aesthetics and visual characteristics such as light, glare and views. The Draft also identifies and discusses two potential alternatives to the Project: (1) a no project alternative and (2) a smaller, code compliant alternative that would contain 17 fewer residential units, more parking spaces, and one rather than two buildings to house both residences and the community center. In addition, the Draft describes two other alternatives the Department considered but rejected as infeasible or failing to meet the project objectives: (1) a "preservation alternative," which would preserve the existing building with a four-story addition in the rear that would contain approximately 20 transitional aged youth housing units, a community room, office and storage and (2) an "adaptive reuse alternative," which would replace the community center with 25 transitional aged youth housing units.

There was enormous community response to the proposal, both positive and negative. Scores of individuals and organizations weighed in. Prevalent among the concerns voiced by neighbors and community groups were the Project's size, scale and density, along with related concerns about its visual impacts and effects on traffic and parking. A number of individuals and neighborhood associations commented that they would support a four-story, 41-unit version of the Project, but strongly objected to the planned 55-foot-tall building as inappropriate for the locale. Others, including neighbors, schools and community organizations, supported the Project as proposed and lauded the Center's mission and the diversity, vibrancy and quality of life it brings to the neighborhood.

On August 5, 2010, the San Francisco Planning Commission (the Commission) held a public hearing on the Draft. A number of neighbors participated and voiced concerns about the Project's size, scale, and visual character relative to the neighborhood. On April 14, 2011, the Department issued the "Comments and Responses" document. The Comments and Responses contains public comments received on the Draft, responses to those comments, and responsive changes to the Draft. To address community concerns regarding the Project's visual character, the Project was modified to reduce the massing along the building's top floor and to break up its bulk into smaller components through different façade treatments and the incorporation of setbacks on the fourth and fifth floors. The Comments and Responses and Draft together comprise the EIR.

On April 28, 2011, the Commission certified the EIR and found it was adequate, accurate, and objective; reflected the independent judgment of the Commission; and complied with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[2] On the same day, the Commission granted the Center's application for a conditional use permit allowing exceptions to planning code provisions concerning street trees, rear yard usable open space and dwelling unit exposure.

Plaintiff appealed both the certification of the EIR and the conditional use permit to the San Francisco Board of Supervisors (the Board). In late June the Board approved the conditional use permit with several conditions related to controlling noise and mitigating the Project's impact on immediate neighbors. The Board also approved, and the mayor signed into law, an ordinance creating the Presidio-Sutter Special Use District to increase the allowed building height to 55 feet and density to up to 54 units. On July 7, the City issued a notice of determination under CEQA announcing its approval of the Project.

Plaintiff filed a petition for a writ of mandate directing the City to vacate its decision to certify the EIR and its approval of the conditional use authorization and special use district. After a hearing on the merits, the superior court issued an order and statement of decision denying the petition. Plaintiff filed this timely appeal from the ensuing judgment.

---

[2] All further statutory references are to the Public Resources Code unless otherwise indicated.

## DISCUSSION

### I. *The City Did Not Preapprove the Project in Violation of CEQA*

Relying on *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 [84 Cal.Rptr.3d 614, 194 P.3d 344] (*Save Tara*), plaintiff contends the City impermissibly "preapproved" the Project prior to certification of the EIR. The contention is unpersuasive.

### A. The Legal Framework: *Save Tara*

■ Under CEQA, local agencies must prepare or cause to be prepared, certify as complete, and consider a final EIR *before* approving or disapproving any project they propose to "carry out or approve," if the project may have significant environmental effects. (§§ 21100, subd. (a), 21151, subd. (a); see Cal. Code Regs., tit. 14, § 15004, subd. (a); *Save Tara, supra,* 45 Cal.4th at p. 121.) The question here is whether the City's involvement in the Project in the years preceding certification of the EIR constituted de facto approval of the Project and thus triggered the EIR requirement long before the City considered the Project's environmental impacts.

■ Identifying the point at which an agency approves a project for purposes of CEQA compliance involves a balancing of competing factors. (Cal. Code Regs., tit. 14, § 15004, subd. (b); *Save Tara, supra,* 45 Cal.4th at p. 116.) As the Supreme Court explained in *Save Tara*: "This court, like the CEQA Guidelines, has . . . recognized two considerations of legislative policy important to the timing of mandated EIR preparation: (1) that CEQA not be interpreted to require an EIR before the project is well enough defined to allow for meaningful environmental evaluation; and (2) that CEQA not be interpreted as allowing an EIR to be delayed beyond the time when it can, as a practical matter, serve its intended function of informing and guiding decision makers. [¶] The CEQA Guidelines define 'approval' as 'the decision by a public agency which commits the agency to a definite course of action in regard to a project.' (Cal. Code Regs., tit. 14, § 15352, subd. (a).) The problem is to determine when an agency's favoring of and assistance to a project ripens into a 'commit[ment].' To be consistent with CEQA's purposes, the line must be drawn neither so early that the burden of environmental review impedes the exploration and formulation of potentially meritorious projects, nor so late that such review loses its power to influence key public decisions about those projects." (*Save Tara, supra,* at pp. 130–131.)

In *Save Tara*, the project proponents maintained that only "unconditional agreements irrevocably vesting development rights" constitute "commitments" that amount to project approval within the meaning of CEQA. (*Save*

*Tara, supra,* 45 Cal.4th at p. 134.) Under this view, "any development agreement, no matter how definite and detailed, even if accompanied by substantial financial assistance from the agency and other strong indications of agency commitment to the project, falls short of approval so long as it leaves final CEQA decisions to the agency's future discretion." (*Ibid.*) The Supreme Court rejected that view. "Such a rule would be inconsistent with the CEQA Guidelines' definition of approval as the agency's *'earliest* commitment' to the project. [Citation.] Just as CEQA itself requires environmental review before a project's approval, not necessarily its *final* approval [citations], so the guideline defines 'approval' as occurring when the agency *first* exercises its discretion to execute a contract or grant financial assistance, not when the *last* such discretionary decision is made." (*Ibid.*) "Moreover, limiting approval to unconditional agreements that irrevocably vest development rights would ignore what we have previously recognized, that postponing environmental analysis can permit 'bureaucratic and financial momentum' to build irresistibly behind a proposed project, 'thus providing a strong incentive to ignore environmental concerns.' " (*Id.* at p. 135.)

The court elaborated: "A public entity that, in theory, retains legal discretion to reject a proposed project may, by executing a detailed and definite agreement with the private developer and by lending its political and financial assistance to the project, have as a practical matter committed itself to the project. When an agency has not only expressed its inclination to favor a project, but has increased the political stakes by publicly defending it over objections, putting its official weight behind it, devoting substantial public resources to it, and announcing a detailed agreement to go forward with the project, the agency will not be easily deterred from taking whatever steps remain toward the project's final approval. [¶] For similar reasons, we have emphasized the practical over the formal in deciding whether CEQA review can be postponed, insisting it be done early enough to serve, realistically, as a meaningful contribution to public decisions." (*Save Tara, supra,* 45 Cal.4th at p. 135.) The court thus rejected the proponents' argument that approval cannot occur before the vesting of development rights.

But the court also rejected the project opponent's view that "any agreement, conditional or unconditional, would be an 'approval' requiring prior preparation of CEQA documentation if at the time it was made the project was sufficiently well defined to provide ' "meaningful information for environmental assessment." ' " (*Save Tara, supra,* 45 Cal.4th at p. 136.) Such a rule "would be inconsistent with the CEQA Guidelines' definition of approval as involving a 'commit[ment]' by the agency. [Citation.] Agencies sometimes provide preliminary assistance to persons proposing a development in order that the proposal may be further explored, developed or evaluated. Not all such efforts require prior CEQA review. [Citation.] Moreover, privately conducted projects often need some form of government consent or assistance

to get off the ground, sometimes long before they come up for formal approval. Approval, within the meaning of sections 21100 and 21151, cannot be equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined. 'If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it.' " (*Id.* at pp. 136–137.) "CEQA review was not intended to be only an afterthought to project approval, but neither was it intended to place unneeded obstacles in the path of project formulation and development." (*Id.* at p. 137; see *Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, 1162–1165 [123 Cal.Rptr.3d 667] (*Cedar Fair*).)

■ Steering between the project proponent's Scylla and its opponent's Charybdis, the Supreme Court applied and elaborated upon "the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B); accord, [*Concerned McCloud Citizens v. McCloud Community Services Dist.* (2007)] 147 Cal.App.4th [181,] 196 [54 Cal.Rptr.3d 1] [agreement [was] not project approval because, inter alia, it 'did not restrict the District's discretion to consider any and all mitigation measures, including the "no project" alternative']; *Citizens for Responsible Government* [*v. City of Albany* (1997)] 56 Cal.App.4th [1199,] 1221 [66 Cal. Rptr. 102] [development agreement was project approval because it limited city's power 'to consider the full range of alternatives and mitigation measures required by CEQA'].)" (*Save Tara, supra*, 45 Cal.4th at p. 138.) The critical question is " 'whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project.' " (*Cedar Fair, supra*, 194 Cal.App.4th at p. 1170, quoting *Save Tara, supra*, 45 Cal.4th at p. 139.)

We independently review the predominantly legal question whether the City approved the Project for purposes of CEQA before it conducted the requisite environmental review. (*Save Tara, supra*, 45 Cal.4th at pp. 131–132 & fn. 10.)

## B. Save Tara's *Application to the City's*
### *Preenvironmental Review Support of the Project*

■ Plaintiff argues that the City preapproved the Project "through its many forms of bureaucratic and political endorsements" long before it

certified the EIR. Specifically, they assert the City improperly committed itself to the Project and foreclosed all other alternatives in 2010 when the mayor's office of housing (MOH) "provided substantial funding for the Project, signed commitments for millions of dollars, assigned numerous senior staff to the Project, and coordinated and designed the Project long before CEQA review was conducted." These activities, in plaintiff's view, amounted under *Save Tara* to de facto approval of the Project and therefore necessitated an EIR long before the City conducted the environmental review process. To analyze this claim, *Save Tara* cautions that "courts should look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project." (*Save Tara, supra,* 45 Cal.4th at p. 139.) Plaintiff's claim does not demonstrate that the City committed itself to the Project so as to preapprove it under the *Save Tara* test.

### 1. *The Predevelopment Loan*

In October 2010, the MOH executed an agreement to loan the Center $788,484, approximately 4 percent of the estimated $20 million needed to complete the project, for predevelopment activities comprised of architectural and engineering design, survey and appraisal preparation, preparation of environmental studies, CEQA and NEPA (National Environmental Policy Act of 1969; 42 U.S.C. § 4321 et seq.) review, legal expenses, loan fees, cost estimates and associated administrative work. The predevelopment loan agreement authorized a maximum disbursement of $550,000 prior to completion of all required CEQA review. Repayment of all loan funds with 3 percent interest was due in 55 years if the SUD (special use district) received approval. If the SUD was not approved by June 30, 2011, the loan would come due immediately. The loan agreement explicitly stated that the City was not committing itself to the project: "By entering into this Agreement, MOH and Borrower intend to preserve the possibility of developing the Project as affordable housing by lending funds to Borrower for the Predevelopment Activities. The City does not, however, commit to or otherwise endorse the Project by entering into this Agreement. The Project remains subject to review by City agencies and City discretion to disapprove or modify the Project."

Plaintiff contends the predevelopment loan agreement impermissibly committed the City to the Project long before environmental review was done. Comparison to the predevelopment agreement in *Save Tara* illustrates the weakness of plaintiff's contention. There, the project developer wanted to

build approximately 35 low-income senior housing units on land owned by the City of West Hollywood. (*Save Tara, supra,* 45 Cal.4th at p. 122.) The city council approved a draft " 'Conditional Agreement for Conveyance and Development of Property' " with the developer that included a $1 million loan from the city. (45 Cal.4th at p. 124.) Approximately $475,000 of the loan was slated for predevelopment costs, including environmental reports and governmental permits and fees, with the remaining "improvement portion" of the loan designated for the construction phase. (*Id.* at pp. 124–125.) The relocation of the existing tenants and all actions necessary to comply with CEQA were to occur before the city would convey the property to the developer and the construction phase would begin. The draft agreement stated that its purpose was " 'caus[ing] the reuse and redevelopment of [the property] with affordable housing for seniors and a neighborhood pocket park, while retaining the historic integrity of the Site.' " (45 Cal.4th at p. 124.)

The draft agreement subjected the city's obligation to convey the property and disburse the "improvement portion" of the loan to several conditions precedent, including the satisfaction of all CEQA requirements " 'as reasonably determined by the City Manager.' " (*Save Tara, supra,* 45 Cal.4th at p. 124.) The city manager, however, could waive these conditions. After the project opponents asserted the city's failure to prepare an EIR before approving the loan and draft agreement violated CEQA, the city and developer executed a revised agreement that removed the city manager's ability to waive CEQA compliance and stated the city retained discretion over " 'any actions necessary to comply with CEQA' " and had no duty to approve any CEQA documents. The revised agreement specified that the developer was to hire a relocation consultant within 30 days to begin the process of relocating tenants. (45 Cal.4th at pp. 125–126.)

The Supreme Court determined from the agreements and surrounding circumstances that the city's approval of the draft agreement and its execution of the revised agreement constituted project approval under CEQA. (*Save Tara, supra,* 45 Cal.4th at p. 140.) In reaching that determination, the court relied on the "forthrightly" stated purpose in both development agreements, "to 'cause the reuse and redevelopment' of [the property] in accordance with the project as outlined in the agreements and in the earlier HUD grant application." (*Ibid.*) Similarly, a city council resolution approving the draft agreement stated the intent to " 'facilitate development of the project'—while allowing further public input on 'the design of project elements.' " (*Ibid.*) It was also significant that the developer was not required to repay the nearly half-million dollar predevelopment portion of the loan unless the city gave the project final approval. (*Ibid.*) If it did not, the money advanced for predevelopment costs would be a total loss. (*Ibid.*)

In addition, the draft agreement "significantly circumscribed" the city's authority to enforce CEQA requirements empowering the city manager to " 'reasonably determine[]' " whether they had been met, "language that could have left City open to charges it acted unreasonably, had it ultimately declined to certify the EIR or make any needed CEQA findings." (*Save Tara, supra*, 45 Cal.4th at p. 140.) It also omitted any provision that would allow an appeal of the city manager's decision to the city council, thereby improperly delegating the council's responsibility under CEQA. (*Save Tara*, at p. 141; see *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 307 [248 Cal.Rptr. 352] [permit condition requiring applicant to submit environmental study to the planning commission and adopt any mitigation measures formulated by commission staff improperly delegated CEQA responsibility to staff and postponed environmental review].) Despite the subsequent revision, the city council's approval of the draft agreement demonstrated its "willingness to give up further authority over CEQA compliance in favor of dependence on the city manager's determination. Given that history, as well as the other circumstances discussed below, City's 'apprehensive citizenry' [citation] could be forgiven if they were skeptical as to whether the city council would give adverse impacts disclosed in the EIR full consideration before finally approving the project." (*Save Tara, supra*, at p. 141.)

The court also determined that certain statements by city officials and staff indicated the city was committed to the project. (*Save Tara, supra*, 45 Cal.4th at pp. 141–142.) Finally, the court found it significant that the city proceeded with tenant relocation on the assumption the redevelopment project would go forward as proposed, and expressly anticipated that the developer would complete the relocation of tenants *before* the city certified an EIR and gave final project approval. All of this "tends strongly to show that City's commitment to the . . . project was not contingent on review of an EIR." (45 Cal.4th at p. 142.) In summary, the court concluded, the city's public announcements that it was determined to proceed with the development, its preparations to relocate the existing tenants from the property, its large at-risk financial contribution to the project, and its willingness to commit itself to going forward if the city manager found CEQA requirements were satisfied demonstrated that the city impermissibly "committed itself to a definite course of action regarding the project before fully evaluating its environmental effects." (45 Cal.4th at p. 142.)

Significant differences from *Save Tara* persuade us the same is not true here. While the contract language is not dispositive, the loan agreement unambiguously states that the Project remained subject to review by City agencies and the City did not commit to or otherwise endorse the project by financing its predevelopment activities. The City's financial support of the Project was expressly restricted to such exploratory and development costs

recognized in *Save Tara* not to require CEQA review. (*Save Tara, supra,* 45 Cal.4th at p. 136 ["Agencies sometimes provide preliminary assistance to persons proposing a development in order that the proposal may be further explored, developed or evaluated. Not all such efforts require prior CEQA review."]; see Cal. Code Regs., tit. 14, § 15262 [projects involving only feasibility or planning studies do not require CEQA review].) This is very different from *Save Tara,* where loan funds were to be used to relocate the existing tenants *before* final project approval. (*Save Tara, supra,* at p. 142.) As the Supreme Court observed, "[r]elocation of tenants is a significant step in a redevelopment project's progress, and one that is likely to be irreversible." (*Ibid.*) Thus, West Hollywood's willingness to immediately begin that process and to complete it before certifying an EIR and approving the project "tends strongly to show that City's commitment to the . . . project was not contingent on review of an EIR." (*Ibid.*) But, in this case, the activities funded by the City's loan are limited to studies, are not irreversible, and will not cause any disruptions of the current activities on the site or physical changes in the environment.

Also in contrast to *Save Tara,* the Center must repay the loan whether or not the Project is approved. Plaintiff contends that even though the loan agreement requires repayment whether or not the Project goes forward, the City in fact does not expect and will not require repayment because it knows the Center is financially dependent on the City and "completely without assets or anyway [*sic*] to repay such 'contingent loans' " unless the project is approved. But these claims are unsupported by the record. Financial statements for the Center from 2005 through 2008 show a modest but consistent annual budget of approximately $650,000 to over $900,000, with various funding sources such as private foundations, grants from City agencies and others, program fees, rental income, and private contributions. MOH, a regular lender to nonprofit housing development organizations, evaluated the Center's audited financial statements in an extensive and detailed loan evaluation to the MOH Citywide Affordable Housing Loan Committee and concluded that its ratio of assets to liabilities for 2008 indicated financial stability. Moreover, the Center has shown itself capable in the past of beneficially structuring its financial picture, as, for example, in its relationship with Drew School (Drew), *post,* and the record presents no solid reason to believe it would be unable to do so again. In any event, the predevelopment loan is secured by a deed of trust against the Center's property, which apparently is not otherwise encumbered. So, if the Project is not approved, and the Center were unable to secure financing or other sources of funding to repay the predevelopment loan, the City can satisfy repayment through the remedies, including foreclosure, provided in the deed of trust. Plaintiff's assertion that the City would do no such thing is mere speculation.

Plaintiff paints a distorted picture of the Center's financial situation when it suggests the City loan is in addition to what plaintiff characterizes as a $426,000 loan from Drew. The Center generates income to support its programs by leasing gymnasium space to Drew and other organizations. In October 2007, Drew paid off the Center's preexisting $426,932 mortgage from Sequoia National Bank in exchange for priority leasing rights to the gymnasium. Drew valued the leasing rights at $200,000, which was donated to the Center, and the Center agreed to repay the remaining $226,932 balance under an unsecured promissory note, with monthly payments of $1,517.47 offset against Drew's lease payments. None of this supports plaintiff's depiction of the Center as so deeply indebted that the City cannot reasonably expect repayment unless it approves the Project.

■ We are also unpersuaded by plaintiff's claim that the Center committed itself to the Project when it accepted the City's loans because the deed of trust requires the site to be used for affordable housing for the next 55 years. Plaintiff argues the parties "impermissibly committed to providing a low-income housing development at [the Center's] site," foreclosing all other reasonable alternative uses prior to environmental review. Plaintiff forfeited this argument by failing to raise it in its opening brief, and it is meritless. The City's support for the low-income housing component does not demonstrate that it committed itself to the Project as proposed and foreclosed all other alternatives prior to environmental review—including, for example, the no project option and the scaled-down version supported by many of the objecting neighbors and neighborhood groups. Even in *Save Tara*, the city's commitment to developing senior housing was only one of many circumstances that demonstrated the city's prereview commitment to the proposed project, including statements by top city officials and its loan of nearly half a million dollars with no provision for repayment were the project not approved. (*Save Tara, supra,* 45 Cal.4th at pp. 140–141.) *Save Tara* does *not* hold that a city's requirement that a public-private redevelopment project provide a specific public service, such as senior or low-income housing, is tantamount to project approval.

### 2. *The Special Use District Ordinance*

■ When a developer includes a certain percentage of affordable housing in a development, state law requires local jurisdictions to grant a "density bonus" and other incentives, such as reduced setbacks and parking requirements. (Gov. Code, § 65915.)[3] For housing developments comprised entirely of low-income units, as here, Government Code section 65915 mandates that

---

[3] "Density bonus" means a density increase over the otherwise maximum allowable residential density. (Gov. Code, § 65915, subd. (f).)

the City provide a 35 percent density bonus over its otherwise maximum allowable residential density. (Gov. Code, § 65915, subd. (f)(1).) In order to meet its obligations under state law, the City enables affordable housing developers to pursue additional density through the creation of SUD's.

Before it proposed the Project, the Center was located in a low-density, residential and mixed zoning district with a maximum building height allowance of 40 feet. This zoning designation permitted a planned unit development of 36 units at the site. On September 14, 2010, Supervisor Alioto-Pier introduced an SUD ordinance to increase the allowed height to 55 feet and the density to more than 54 units, depending on the inclusion of affordable housing as a component of development. On April 28, 2011, the Commission recommended that the City approve an ordinance to amend the City's zoning map to reflect the boundaries of the new Presidio-Sutter SUD and change the existing height limit from 40 feet to 55 feet. The Board approved the ordinance on June 28.

■ Plaintiff argues that Supervisor Alioto-Pier's introduction of the SUD ordinance constituted "legislative action" amounting to project approval under CEQA. Its argument misstates the law. Plaintiff supports its argument with the final sentence of California Code of Regulations, title 14, section 15352, subdivision (a), part of the Guidelines for Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.), and assert that "environmental review must be undertaken before a City proposes or adopts any motion or ordinance which would affect a proposed project." In full, section 15352, subdivision (a) says: " 'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. *Legislative action in regard to a project often constitutes approval.*" (Cal. Code Regs., tit. 14, § 15352, subd. (a), italics added.) But "often" does not mean "always," and the introduction of legislation is not the equivalent of a "decision by a public agency," let alone a decision that "commits" it to "a definite course of action." Plaintiff provides no authority for its claim that a supervisor's introduction of proposed legislation for consideration by the Board is the same, for CEQA purposes, as the Board's approval of an ordinance. ■ To the contrary, the City charter specifies that the Board can act "only by written ordinance or resolution"—which requires the vote of a majority of its members. (S.F. Charter, § 2.105.) In this case, approval occurred on June 28, 2011, two months *after* the EIR was certified.

### 3. *Other Circumstances*

Plaintiff contends the commitment of staff resources and public statements by the MOH in support of the Project also demonstrate City commitment to and approval of the Project prior to environmental review. Here too, we are unpersuaded.

First, plaintiff asserts that notes from a November 28, 2006, Department meeting show Supervisor Alioto-Pier, and, impliedly, the City, was already committed to the Project by that date. The relevant notes state: "**Background**: To demolish community center and construct a new 65' mixed-use building with work force and affordable housing and community center. Environmental Review application has been filed. [¶] **Case Issues**: Project would require changing the height district from 40-X to at least 70. Supervision [*sic*] Alioto-Pier has indicated that she supports this project and will initiate the height change. Staff has serious concerns regarding the proposed height (the Director agrees with staff). The project sponsor has been advised of these concerns. [¶] **Recommendations**: At the last project review meeting, it was suggested that the Director express staff concerns to the Supervisor."

These notes do not demonstrate the City's preapproval of the Project. As discussed above, one supervisor's advocacy for the Center's expansion is not equivalent to action, let alone approval, by the City. Moreover, the cited notes show the proposal was a work in progress. Department staff and its director believed the Project as then proposed was too high and legislation introduced in 2010 reduced it to 55 feet. Indeed, a competing ordinance proposed in 2011 but withdrawn would have reduced that by yet another 10 feet. Plaintiff's assertion that the proposal by Supervisor Alioto-Pier in 2006 reveals the City was already committed to a specific plan cannot be squared with the administrative record.

A series of May 2010 internal MOH e-mails plaintiff relies upon as evidence of preapproval are no more persuasive. Plaintiff asserts these communications show that "[t]he approvals, the CEQA process, and the outcome of Project review [were] assumed and assured . . . as the staff at MOH acts as the owner and project sponsor adjusting the design and coordinating the approval (not the review) with Planning. . . ." We disagree. They show that MOH project staff, understandably, had significant involvement and input in the Project's design. This is neither unusual, suspicious, nor demonstrative of preapproval. As *Cedar Fair* and other cases have recognized, "[t]he modern phenomenon of 'public-private partnerships' for development makes the time of 'approval' under CEQA more difficult to ascertain since a local agency may be a vocal and vigorous advocate of a proposed project as well as an approving agency. But 'an agency does not

commit itself to a project "simply by being a proponent or advocate of the project . . . ." ' " (*Cedar Fair, supra,* 194 Cal.App.4th at p. 1173; see *City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 688 [74 Cal.Rptr.2d 497] ["If having high esteem for a project before preparing an [EIR] nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it."].)

Plaintiff's reliance on various "public statements" as evidence the City approved the project before it conducted environmental review is no more persuasive. Three such statements are flyers or brochures issued *by the Center*—not the City—about its proposed expansion. Of these, one includes a picture of Supervisor Alioto-Pier and quotes her as saying, "The Booker T. Washington Community Services Center is an established and vital fixture in District 2. I will continue to support all the great work it does for families and children." Another appears to be an informational flyer about the Center's expansion plans that contains a solicitation of donations and invitation to the community to submit comments and suggestions, while the third, dated October 2010, announces a "kickoff celebration for the new Booker T. Washington Community Service Center." None of these were generated by the City, and they give no indication that the City had in any way approved the Project or foreclosed alternatives to it.

Lastly, plaintiff points to an April 2011 e-mail from Rachel Antrobus, the executive director of the nonprofit organization TAYSF (Transitional Age Youth San Francisco) that originated from an sfgov.org e-mail address, as evidence of the City's commitment to the specific Project. Plaintiff concedes that Antrobus is not a City employee. The e-mail explains that TAYSF staff inadvertently sent out sample letters of support for the Project from Antrobus's sfgov.org address rather than from the organization's taysf.org address, after the Project's developer asked TAYSF to facilitate gathering letters of support for the April 28, 2011, Commission meeting. Antrobus acknowledged that sending the e-mail, particularly from a City e-mail address, was both accidental and inappropriate, particularly since it supported a mistaken perception that she is a City employee. Here, again, one communication from the head of a nonprofit organization that advocates for transitional age youth does not show that the City had approved of or committed to the Project.

These "public statements" stand in sharp contrast to those said to demonstrate West Hollywood's premature commitment to the project at issue in *Save Tara.* The statements in *Save Tara* included the city manager's statements that the city " 'has approved the sale of the property' " and " 'will commit' up to $1 million in financial aid"; the mayor's announcement that a HUD grant " 'will be used' " for the project; statements in the city's newsletter that the

city " 'will redevelop the property' "; and the city's housing manager's statement at a city council meeting that "while there were 'options to consider' regarding project design, options for other uses of the property (as a park, library, or cultural center) had already been ruled out." (*Save Tara, supra,* 45 Cal.4th at pp. 141–142.) Although "expressions of enthusiasm for a project by an agency's staff members should not be confused with official approval," and that such statements in isolation "could rarely, if ever, be deemed approvals for CEQA purposes," the court observed, the public statements in *Save Tara* were from highly authoritative sources. (*Id.* at p. 142, fn. 13.)

Not so here. Neither Supervisor Alioto-Pier's advocacy of the Project, nor a lone e-mail from a nonprofit organization soliciting support for it, albeit inadvertently sent from a City e-mail address, nor the Center's publications promoting the Project indicate the City improperly committed to the Project prior to the requisite environmental review.

## II.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. Respondents and real party in interest are entitled to costs on appeal. (Cal. Rules of Court, rule 8.278.)

Pollak, Acting P. J., and Jenkins, J., concurred.

---

*See footnote, *ante*, page 540.